In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 11-3622 & 12-2596

DAYA DINKAR BATHULA, et al.,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petitions for Review of Orders
of the Board of Immigration Appeals.
A098-516-459, A098-696-572

ARGUED FEBRUARY 12, 2013—DECIDED JULY 25, 2013

Before RIPPLE and TINDER, *Circuit Judges*, and ZAGEL,
*District Judge*.[*]

RIPPLE, *Circuit Judge*. Daya Dinkar Bathula and her
husband, Bathula Dinkar Christopher Reddy, citizens
of India, applied for asylum in separate affirmative ap-
plications before the Asylum Office. They claimed that

[*] The Honorable James B. Zagel, of the Northern District of
Illinois, sitting by designation.

their family had been subjected to persecution at the hands of a local criminal group after Mr. Reddy testified against certain of its members on trial for murder. The asylum applications were denied by the Department of Homeland Security ("DHS"). In removal proceedings, they together renewed their request for asylum and alternatively requested withholding of removal and relief under the Convention Against Torture ("CAT"). The immigration judge ("IJ") denied relief and ordered them removed to India, and the Board of Immigration Appeals ("BIA" or "Board") adopted and affirmed the IJ's decision. Thereafter, they sought reopening before the Board on the basis of ineffective assistance of counsel, and the Board again denied relief. They now petition for review of both the initial final order of removal of the Board and the order denying reopening. For the reasons set forth in this opinion, we deny their petitions.

# I

# BACKGROUND

## A. Facts

Mr. Reddy and Ms. Bathula are citizens of India and former residents of the town of Madhapur in the state of Andhra Pradesh. They have two adult children, a son and a daughter. In India, Ms. Bathula was a trained preschool teacher and worked in the home; Mr. Reddy studied law, worked in real estate and, beginning in roughly 1991, became active in the local politics of a regional party, the Telugu Desam Party ("TDP"). Mr. Reddy rose through the local ranks of the TDP, eventu-

ally attaining the position of a "legal cell general secretary."[1] His party work occurred on a daily basis, without compensation, and totaled a few hours a week, while his real estate business provided his living.[2] His position afforded him a degree of influence over public matters. Because of his position, he also sometimes attempted to mediate private disputes as a representative of the TDP.

A "land mafia" had been active in Mr. Reddy's area of the country since the 1990s.[3] According to Mr. Reddy's description, the land mafia illegally "grab[s]" public land to sell on the private market.[4] Their precise workings are not clear from the record, but it is clear that they use illegal means to acquire land, sometimes with the complicity of government officials. They also capitalize on the inefficiencies of the Indian judicial system, knowing that any challenge to particular land actions requires a complainant to institute a civil action that is likely to languish over some period of years, even if it would eventually be resolved against them.[5] By the early 2000s, the land mafia operating in Mr. Reddy's

---

[1] A.R. at 386. All record citations in this opinion are to the Administrative Record filed in case 12-2596.

[2] *Id.* at 387, 545.

[3] *Id.* at 391.

[4] *See id.* at 391-92. In the documents filed with the motion to reopen, Mr. Reddy described them principally as "squatting" on vacant land. *Id.* at 109.

[5] *See id.* at 392.

town consisted of twenty to thirty individuals, including a man named Arjun, who was also a TDP official.

Allah Baksh,[6] a neighbor of Mr. Reddy's, began complaining that the land mafia had constructed, on a public road, a shop that partially blocked the entrance to Baksh's home. He initiated legal proceedings against Arjun, and Mr. Reddy unsuccessfully attempted to arbitrate the dispute on behalf of the TDP. Baksh eventually obtained an order to demolish the shop Arjun had built, and, on January 28, 2002, when municipal officials came to accomplish the demolition, several hundred people were watching. Baksh walked out of a store near his home, and Arjun and his men pursued him. Mr. Reddy and dozens of others witnessed Arjun and his companions murder Baksh using construction stones.

Mr. Reddy had reservations about testifying in the ensuing legal proceedings. Nevertheless, he and more than twenty other individuals ultimately agreed to cooperate with the investigation and to testify against Arjun and the mafia. Mr. Reddy claims that he was motivated by a desire to take a firm stance on crime. Prior to the trial, he was interviewed by a television station regarding the murder, and the evening report made his name and face public. Mr. Reddy soon began receiving threats: He received anonymous calls roughly twice a

---

[6]  Mr. Baksh's name is transcribed inconsistently in the record. We have used the form employed by the IJ's opinion. *See, e.g., id.* at 331.

week telling him that he was "finished";[7] twice rocks were thrown into his home compound; and people twice knocked on his door in the middle of the night and ran. He made complaints to the police about the threats. The land mafia also attempted to bribe him to persuade Baksh's widow to accept a compromise and drop the criminal case. He declined and reported the pressure to the authorities.

Ms. Bathula also was targeted. She was trailed by Arjun's associates five or six times and ultimately elected to remain in the house for safety.

In February 2003, Mr. Reddy testified against Arjun and his cohort. He was the only original witness who had not been persuaded by bribe or threat to recant. The men were convicted and sentenced to life imprisonment, but have since been released.

Following his testimony, the pressure on Mr. Reddy and his family continued. He was run off the road by another vehicle that deliberately had crashed into him, and he was stopped on the street and again threatened that he would be "finished."

Throughout this period, Mr. Reddy had been given significant police protection from the threat of harm by Arjun and his associates. At certain times—the week after trial, holidays, furlough periods for prisoners, crowded festivals—police would remain at his home around the clock. Mr. Reddy testified that, "[a]s a TDP member, [he] had a little leverage in the police depart-

---

[7]  *Id.* at 431-32.

ment," and so the police "would help [him] if [he] ha[d] some trouble."[8]

In May 2004, Ms. Bathula came to the United States for a wedding, intending to stay three months. At about the same time, national elections were held, and the Congress Party, which is not allied with the TDP, took power. The new Congress government removed the former police official that had authorized the assistance to Mr. Reddy and his family, and Mr. Reddy felt that the family's safety could not be assured. He therefore instructed Ms. Bathula to remain in the United States.

Mr. Reddy traveled to the United States in June of 2006 on a visitor's visa.

## B. Removal Proceedings

### 1. Proceedings Before the IJ

In November 2004, a few weeks before the expiration of her visitor's visa, Ms. Bathula filed an asylum application based on the events surrounding Baksh's murder and the trial at which Mr. Reddy had testified. Ms. Bathula's application was denied, and she was placed in removal proceedings.

In June 2006, Mr. Reddy was admitted to the United States as a visitor. Five months later, he filed his own asylum application, on which he included Ms. Bathula as a derivative. In early 2007, his application also was denied, and he was placed in removal proceedings.

---

[8] *Id.* at 405.

Before the IJ, the separate proceedings involving Ms. Bathula and Mr. Reddy were consolidated. Ms. Bathula and Mr. Reddy filed an updated application requesting asylum, withholding of removal and CAT relief. In two hearings held two-and-one-half years apart, the petitioners presented evidence in support of their claims. Ms. Bathula and Mr. Reddy were the only witnesses.

In addition to the facts set forth above, the petitioners' written submissions and testimony also addressed several other subjects. Mr. Reddy claimed that during the two years following Ms. Bathula's entry into the United States, he remained in India in hiding, moving among relatives' houses and staying away from his own home. He admitted that he was not harassed in these locations. He stated that he was forced to leave one relative's home in the state of Goa upon learning of a plot by the land mafia to find him. The Reddy home was vacant during this period, and in 2005, when their daughter briefly returned, she alerted the police that it had been broken into, jewelry and valuables stolen, and a rod-like weapon left on the bed. Ms. Bathula also testified about an incident involving their daughter in which men associated with the land mafia unsuccessfully attempted to kidnap her;[9] Ms. Bathula's testimony re-

---

[9] As the daughter's own affidavit submitted with the motion to reopen describes it, on a return home from school one day she saw a man who she knew to be associated with the land mafia. He opened the trunk and came towards her with his arms out, which she interpreted as an attempt to take her.

(continued...)

garding the details, however, was somewhat vague and inconsistent, especially as to the date. The family stated that although the son safely attended flight school, the daughter was unable to continue her schooling and was forced to move every few months for her safety.

Ten months after the close of the proceedings, the IJ issued a lengthy written decision denying all relief and ordering removal.

The IJ credited the bulk of the petitioners' testimony regarding the existence of the land mafia, Mr. Reddy's role in opposing its members at the murder trial and the actions taken by the land mafia against the family in response. The IJ, however, found the petitioners' testimony not credible on several points: First, the IJ did not credit Mr. Reddy's testimony about his movements in the two-year period after the trial and before he departed for the United States, calling it "vague and unpersuasive" and "not sufficiently detailed to be credible."[10] Second, the IJ concluded that Ms. Bathula's account of the attempted kidnapping of their daughter was "conflicting and uncorroborated."[11] Specifically, the IJ observed that the written submissions had indicated that the incident occurred in June 2004, when the Congress party was in power and Ms. Bathula was in

[9] (...continued)

She was on a public street and screamed out, and her alleged kidnapper fled. *Id.* at 139.

[10] *Id.* at 337, 338.

[11] *Id.* at 338.

the United States, but her oral testimony indicated that it had occurred in 2003, when the TDP was in power. In his view, "the date of the attempted kidnapping . . . [wa]s so unclear as to call into question whether it occurred at all."[12] Finally, although the IJ generally accepted the testimony regarding the land mafia's local activities and found it corroborated by the documentary evidence in the record, he did not believe that the evidence supported Mr. Reddy's assertions that the local network had nationwide connections that would have endangered him anywhere in India.

Turning to the legal basis for the claim, the IJ found (1) that the petitioners had not established that any harms they suffered were "on account of" a protected ground (the "nexus" requirement), (2) that the harms suffered in the past did not rise to the level of persecution and (3) that the possibility of internal relocation precluded a finding of a well-founded fear of future persecution.

Regarding nexus to a protected ground, the IJ first expressed doubt that either social group identified by the petitioners, "active, law-supporting citizens" or "those willing to participate, despite personal risk, in the orderly administration of justice against criminal elements," were the basis for the harms that Mr. Reddy and his family

---

[12] *Id.* at 344.

suffered.[13] The IJ noted that the record was devoid of any evidence of widespread harm to the large group of law-supporting citizens who never had interfered with the land mafia. Further, he found that, despite Mr. Reddy's opposition to the land mafia's activities, Arjun and his cohort did not seek to harm him until he testified against them; in the IJ's view, therefore, the land mafia's motivation was retribution for the testimony. Citing *Gatimi v. Holder*, 578 F.3d 611 (7th Cir. 2009), and *Wang v. Gonzales*, 445 F.3d 993 (7th Cir. 2006), the IJ concluded that such a motivation was best characterized as personal animus rather than membership in any identifiable social group necessary to establish asylum eligibility.

Nor, in the IJ's view, had the petitioners presented a viable political opinion claim. The petitioners acknowledged that TDP membership had not motivated the land mafia, but they claimed it was the reason that the police had denied protection to the family following the 2004 elections and the change in government. The IJ disagreed. He noted Mr. Reddy's testimony that, in the period before and immediately following the trial, when the TDP was in power, his TDP membership had afforded him additional access to law enforcement resources, including twenty-four hour protection at his home for periods of time. In his view, the fact that, follow-

---

[13] *Id.* at 341. The IJ presumed that this group encompassed Baksh as well, because he had challenged the land mafia in civil courts.

ing the election, the family was no longer provided with protective law enforcement presence at their home was better characterized as "a lack of special treatment" previously provided on the basis of TDP member-ship rather "than a [new] policy of discrimination" against TDP members after 2004.[14]

Regarding whether the family had suffered past persecu-tion, the IJ concluded that the record fell short; instead, the evidence demonstrated primarily a series of unfulfilled threats and a pattern of harassment and in-timidation. Although there had been testimony re-garding "more serious and concrete threats," including the attempted kidnapping, the IJ already had deter-mined that the testimony was not credible on these points.[15] With no threat carried out, and no threat "so immediate and menacing" as to itself qualify as persecu-tion, the harms "in the aggregate" did not rise to the level of persecution.[16]

Furthermore, the IJ found no evidence that the govern-ment was unable or unwilling to protect the fam-ily. Although the significant protection they had received from the TDP-appointed law enforcement officials had ended, the IJ concluded that there were many reasons such a decision could have been made by an unbiased officer. He noted that the change of government had

---

[14] *Id.* at 342.

[15] *Id.* at 344.

[16] *Id.*

occurred a year after the trial and, in the interim, the perpetrators had been sentenced and imprisoned. The IJ also concluded that the prosecution of Baksh's murderers demonstrated that "[t]he government ha[d] proven capable of protecting the [petitioners]."[17] The IJ already had rejected Mr. Reddy's testimony regarding his two years in hiding, but separately found that, because the evidence regarding the years following the trial was "generalized" and included "very few details regarding his life interactions with the local police, or his life as a fugitive," it was "impossible . . . to conclude that the [Indian] government became completely helpless or apathetic to the [petitioners'] plight."[18] The IJ also suggested that denial of police protection services at the family home was not itself a sufficient harm to amount to persecution.

Finally, on the issue of a well-founded fear of future persecution, the IJ held that the family had not demonstrated adequately an inability to relocate within India. The IJ concluded that the particular land mafia was a local one. It operated in a specific town and was controlled principally by the Eranolla family, of which Arjun was a member. Mr. Reddy's claims to the contrary were, in the IJ's view, speculative and lacked "objective and reliable" support in the evidentiary record.[19] The record did not support the assertion that Mr. Reddy would have to remain effectively in hiding to have a

---

[17] *Id.*

[18] *Id.*

[19] *Id.* at 346.

measure of safety in India. Indeed, the IJ specifically noted that Mr. Reddy's son had lived in New Delhi without any difficulty.

Having concluded that the petitioners did not meet the burden of establishing eligibility for asylum, the IJ also denied relief under the higher standards of proof applicable to withholding of removal. The IJ also denied the petitioners' CAT claim without considering whether the record supported a likelihood of torture, instead concluding again that the possibility of internal relocation barred such relief.

### 2. Appeal to the BIA

The petitioners, still represented by their trial attorney, appealed the denial of asylum and withholding to the Board, but abandoned their CAT claim. The Board adopted and affirmed the IJ's decision ordering removal, but added as well its own analysis.

The Board first rejected the petitioners' claim that the IJ had disregarded the evidence or had failed to aggregate the harms that both petitioners suffered. It also agreed with the IJ's determination that the harm did not rise to the level of persecution. On the subject of nexus, the Board described the petitioners' situation as "unfortunate," but agreed with the IJ's conclusions that the petitioners' harms were based on "a purely personal matter" that was "not tethered to a statutorily protected

category."[20] The Board further agreed that Mr. Reddy was not harmed on the basis of his political opinion when the police officials appointed by the new Congress government declined to extend him the same "special privileges" that had been provided under the previous administration on account of Mr. Reddy's "political connections."[21] Finally, the Board noted without discussion that the petitioners "failed to meet their burden of establishing a well-founded fear of future persecution by showing a reasonable possibility of persecution that cannot be avoided by reasonably relocating within[] their home country given the local nature of the 'land mafia' criminals."[22]

In summary, the Board concluded that the IJ had "correctly determined that the [petitioners] fear a small number of criminals, that their account indicates that the police are capable of protecting the public, and that the [petitioners] may relocate to avoid any future problems."[23] Accordingly, for the reasons identified in the Board's opinion "and those additional and alternative bases

[20] *Id.* at 258. The Board assumed without deciding that the social groups proffered by the petitioners were cognizable under the Immigration and Nationality Act, but concluded that the harms that the family had suffered were not "on account of" membership in the identified groups. *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

and reasons discussed by the Immigration Judge," the Board adopted and affirmed the order of removal.[24]

### 3. Motion to Reopen Proceedings Before the Board

The petitioners retained new counsel and moved to reopen their proceedings with the Board. They contended that their prior attorney had provided ineffective representation, and, as a result, they were denied due process of law. They addressed the requirements in the Board's decision setting forth the standards for ineffective assistance claims, *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988). The petitioners contended that two of the prior attorney's decisions were so egregiously wrong as to demonstrate ineffective assistance. First, they claimed that, although their daughter was available in the United States to testify at the time of the second hearing, their attorney had not called her as an additional witness. The failure, they contended, was consequential: The IJ had refused to credit Ms. Bathula's account of arguably the most serious incident the petitioners had described, the attempted kidnapping of their daughter. The IJ rejected the testimony because Ms. Bathula's uncorroborated narrative had not given a consistent account of when it had occurred. Second, they claimed that their attorney was ineffective because he had not pursued the CAT claim on appeal. The petitioners noted that the IJ and Board had rejected their claims not only because they

---

[24] *Id.* at 259.

had failed to demonstrate past persecution or a well-founded fear of future persecution, but also because any harms that they had suffered did not have the nexus to a protected ground required by the statute for asylum and withholding of removal. The petitioners observed that the statute requires *no nexus* to a protected ground for a petitioner to succeed under the CAT, and, therefore, their attorney's decision to abandon the CAT claim prejudiced their proceedings before the Board. In their view, the CAT claim, because of the absence of a nexus requirement, provided a stronger avenue for relief.

Along with the motion to reopen, they submitted an affidavit from their daughter in which she described the attempted kidnapping, as well as an incident in which her scooter was rammed from behind and an incident in which she elected to remain safely inside a college building after believing she saw the same car involved in the attempted kidnapping outside waiting for her.[25]

---

[25] The filings also included the petitioners' prior attorney's response to the disciplinary complaint that the petitioners had filed against him. He claimed that Mr. Reddy was adamant that his daughter should not testify or otherwise be involved in the proceedings, and that, in any event, he believed that, in the limited time he had to present the petitioners' case to the IJ, the petitioners' own testimony was of greater significance. In his words, he made a tactical choice not to appeal the CAT claim, because he believed it was weaker; although a nexus to a protected ground was not required to succeed, the petitioners would have to have

(continued...)

The Board denied the motion to reopen. It noted that the claim had been denied in part because the petitioners had failed to establish the requisite nexus, and the daughter's testimony would not have corrected that failing. It also ruled that the former attorney's "tactical decision" not to appeal the CAT claim did not cause prejudice, because it did not address the failure of the petitioners to establish that internal relocation was not possible.[26]

Ms. Bathula and Mr. Reddy timely petitioned for review of each decision.

## II

## DISCUSSION

### A. The Initial Order of Removal

#### 1. Standards on Review

Where, as here, "the BIA's decision adopts and affirms the IJ's conclusion as well as provid[es] its own analysis,

---

[25] (...continued)
shown a higher level of harm, which the IJ already had found lacking under the lower burden applicable to asylum. The petitioners submitted a supplemental affidavit disputing their attorney's account of the decision not to have their daughter testify.

[26] *Id.* at 4. In a footnote, the Board took note of the attorney's response, which indicated that the decision not to appeal the CAT claim was based on the "lack[ of] solid evidence or a solid argument regarding both internal relocation and government acquiescence for purposes of CAT relief." *Id.*

we review both decisions." *Familia Rosario v. Holder*, 655 F.3d 739, 743 (7th Cir. 2011). We review the Board's decision denying asylum and withholding of removal for substantial evidence. *Vahora v. Holder*, 626 F.3d 907, 912 (7th Cir. 2010). "Our standard of review for legal questions is de novo; [h]owever, we defer to the Board's factual findings, reversing the Board only if the record lacks substantial evidence to support its factual conclusions." *Id.* (alteration in original) (internal quotation marks omitted). "Under the substantial evidence standard, the agency's determination will stand if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (internal quotation marks omitted). Reversal is appropriate only where, reviewing the record as a whole, "a reasonable factfinder would have to" reach a contrary conclusion. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

In order to obtain asylum, an alien must establish that he meets the definition of a refugee set forth in 8 U.S.C. § 1101(a)(42)(A), specifically, that he "is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [his home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."

To establish eligibility for withholding of removal, an alien must demonstrate a "clear probability," *Mustafa v. Holder*, 707 F.3d 743, 751 (7th Cir. 2013) (internal quotation marks omitted), that his "life or freedom would be threatened in that country because of the alien's race,

religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

An alien's proof of eligibility for asylum or withholding may follow one of two paths, or, in many cases, both: He must show that he has suffered past persecution or that he has a well-founded fear of future persecution.[27] If the alien can establish that he has suffered past persecution on the basis of a protected ground, the existence of a well-founded fear is presumed. 8 C.F.R. § 1208.13(b)(1) (asylum); *id.* § 1208.16(b)(1) (withholding). The Government can rebut the presumption by showing either a fundamental change in conditions in the applicant's home country or that, "under all the circumstances, it would be reasonable to expect the applicant to" relocate "to another part of the applicant's country." *Id.* § 1208.13(b)(1)(i) (asylum); *see also id.* § 1208.16(b)(1)(i) (withholding). "In cases in which the applicant has not established past persecution," that is, where the alien proceeds by claiming exclusively a well-founded fear of future persecution, however, "*the applicant* shall bear the burden of establishing that it would not be reasonable for him . . . to relocate, unless the persecution is by a government or is government-sponsored." *Id.* § 1208.13(b)(3)(i) (emphasis added) (asylum); *see also id.* § 1208.16(b)(2) (withholding).

Mr. Reddy and Ms. Bathula attempted to establish past persecution and a well-founded fear of future

---

[27] A well-founded fear is one that is both "subjectively genuine and objectively reasonable." *Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008).

persecution. Their claims were denied by the agency on multiple grounds. First, the IJ and Board found that the harms the petitioners experienced did not rise to the level of past persecution. Second, the IJ and Board found that, even if the harms did rise to the level of past persecution, the petitioners had not identified a nexus to a protected ground under the statute, i.e., that they had been persecuted, or would be persecuted on account of race, religion, nationality, membership in a particular social group, or political opinion. Finally, because the agency concluded that there had been no showing of past persecution, the petitioners could succeed only by demonstrating independently a well-founded fear of future persecution and that the risk of that persecution was present on a country-wide basis such that internal relocation was not reasonable. The IJ and Board determined that the petitioners had not carried this burden.

The petitioners claim that each of the agency's determinations is not supported by substantial evidence. We address their arguments in turn. However, because we conclude that the agency's conclusions regarding a lack of past persecution and a lack of a nexus under the statute are supported by substantial evidence, we need not and do not consider whether the record establishes that internal relocation would have been unreasonable or that the Indian government was involved in or acquiesced in the land mafia's treatment of the petitioners.

### 2. Past Persecution

The IJ credited the petitioners' testimony that, in the months leading up to and following Mr. Reddy's testi-

mony at the murder trial, the family received calls roughly twice a week threatening to "finish" Mr. Reddy, the compound was twice attacked by someone throwing rocks and twice individuals approached the door in the middle of the night and then fled. In addition, Mr. Reddy was approached on the street by a land mafia associate and told that he would be "finished." On another occasion, his car was run off the road by someone he identified as associated with the land mafia. Ms. Bathula and their daughter also were trailed five or six times by a relative of Arjun, and Ms. Bathula felt it safer if she remained in the home.

In reaching the conclusion that these harms, considered in the aggregate, did not rise to the level of persecution, the IJ began by noting the general rule that threats are insufficient to demonstrate past persecution, citing *Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006). He characterized the harm suffered by the family as "a series of threats and harassment."[28] The petitioners take issue with this characterization of the record as an understatement of their treatment by the land mafia. They submit that the incidents described rose above threats to actual harm, and that, in any event, even if the record could be characterized as showing threats alone, those threats were of sufficient severity to constitute persecution without actual harm.

We begin by noting that neither the IJ nor the BIA employed a "threats-alone" approach to the petitioners'

---

[28] A.R. at 343.

evidence. Moreover, the language of the IJ's opinion, noting a pattern of "threats *and harassment*" echoes precisely the language we often employ to distinguish between those harms that rise to the level of past persecution and those that do not. *See, e.g.*, *Chun Hua Zheng v. Holder*, 666 F.3d 1064, 1067 (7th Cir. 2012) (describing beating as conduct that "crosses the line that distinguishes *persecution* from *mere harassment*" (emphasis added)). In any event, our task is to assess whether the agency's ultimate conclusion that the record does not establish past persecution is supported by substantial evidence. *See Elias-Zacarias*, 502 U.S. at 481. We conclude that it is.

In considering the line between conduct that is best characterized as harassment and conduct that is truly persecutory, we recently stated:

> Harassment involves targeting members of a specified group for adverse treatment, but without the application of significant physical force. Had [the alleged persecutors,] furious at [the petitioners] being soft on Albanians[,] followed his taxi (he was a taxicab driver in Macedonia) and ticketed him whenever he exceeded the speed limit by one mile per hour, that would be an example of harassment. A common form of sexual harassment is pestering a subordinate for a date or making lewd comments on her appearance, or perhaps hugging her, which is physical but generally not violent.

> Persecution involves, we suggest, the use of *significant* physical force against a person's body,

or the infliction of comparable physical harm without direct application of force (locking a person in a cell and starving him would be an example), or nonphysical harm of equal gravity—that last qualification is important because refusing to allow a person to practice his religion is a common form of persecution even though the only harm it causes is psychological. Another example of persecution that does not involve actual physical contact is a credible threat to inflict grave physical harm, as in pointing a gun at a person's head and pulling the trigger but unbeknownst to the victim the gun is not loaded.

The line between harassment and persecution is the line between the nasty and the barbaric, or alternatively between wishing you were living in another country and being so desperate that you flee without any assurance of being given refuge in any other country.

*Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011) (emphasis in original).

Here, the cases that the petitioners cite in support of their assertion that the record establishes past persecution speak of harms on a wholly different order than what the petitioners themselves were forced to endure. *See* Pet'rs' Br. 12-13 (collecting cases). Although the petitioners rightly assert that we have held that credible threats of imminent death or serious physical harm can themselves amount to past persecution, *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997) (acknowledging that

threats "of a most immediate and menacing nature might, in some circumstances, constitute past persecution"), we have done so under circumstances much more severe than those presented here. The character of the threats and the accompanying menacing behavior in the present case, even when we account for the fact that they were carried out by a group with the ability and will to physically harm or kill its opponents, are simply not such as would require the agency to conclude that they amount to persecution. In particular, although the family was not under constant protection and had numerous personal encounters with members of the land mafia, no serious harm ever befell them, despite the fact that the group was willing to murder another opponent in plain sight of a crowd on a public street. *Cf. Vahora*, 626 F.3d 907 (holding that a teenager targeted after he witnessed a murder, who was chased from his home by the perpetrators, who was repeatedly and menacingly sought after his departure, and whose grandparents' home was burned, had not established past persecution).

Accordingly, the agency's decision that the petitioners did not suffer past persecution is supported by substantial evidence, and we shall not disturb it.

### 3. Nexus to a Protected Ground

Even if an alien satisfies the burden of establishing the requisite fear of persecution, he does not automatically obtain relief: "He must also show that the feared persecution would be on account of his race, religion, nationality,

membership in a particular social group, or political opinion." *Matter of Mogharrabi*, 19 I. & N. Dec. 439, 447 (BIA 1987).

Before the agency, the petitioners put forward claims related to Mr. Reddy's political opinion as an official in the TDP, as well as membership in two possible social groups: "active, law-supporting citizens" and "those willing to participate in the legal process, despite great personal risk, to ensure justice against criminal elements."[29] The Board, however, viewed any harm that the petitioners suffered as the result of a "personal dispute" with the land mafia "that is not tethered to a statutorily protected category."[30] The Board further stated that "even assuming, *arguendo*, that the [petitioners'] proposed social groups are sufficient under the Act, they have failed to establish that the past or feared harm in India is *on account of their membership in such groups*, or on account of any other protected ground."[31]

We need not examine the sufficiency of the petitioners' proffered social groups under the statute because we conclude that the Board's decision that the petitioners failed to establish that any harm befell them *on account of* their membership in either group is supported by substantial evidence. As the Board noted, the record is devoid of evidence that "active, law-supporting citizens,"

---

[29] A.R. at 258 n.2

[30] A.R. at 258.

[31] *Id.* (second emphasis added).

generally, are targeted for persecution in India. Although the more specific group of "those willing to participate in the legal process, despite great personal risk, to ensure justice against criminal elements" presents a closer question, it does so only modestly. As the Board points out, the record evidence does not suggest that Mr. Reddy was targeted because he was willing, or, in fact, did "participate in the legal process." There is no suggestion in the record that the land mafia sought to destroy the legal process generally, or to attack those who supported it. Mr. Reddy's filings clearly demonstrate that he was the victim of intimidation and then retaliation for his specific testimony in a specific case against the land mafia.[32]

---

[32] Before this court, the petitioners essentially admit that this much narrower issue was the land mafia's motivation, here describing their social group as "people willing to be witnesses to ensure prosecution of crimes the land mafia commits." Pet'rs' Br. 18. The petitioners claim that this makes their case comparable to *Sepulveda v. Gonzales*, 464 F.3d 770, 772 (7th Cir. 2006), in which we remanded a case for further proceedings upon concluding that former prosecutors targeted by an insurgent group could constitute a social group. Even if this formulation had been preserved by presenting it directly to the Board, *cf.* A.R. at 262-63 (describing the proffered social groups in the appeal to the Board without this formulation), we are not persuaded that *Sepulveda*, rather than *Pavlyk v. Gonzales*, 469 F.3d 1082, 1088-89 (7th Cir. 2006), is the closest analog in our cases.

(continued...)

The Board's conclusion that Mr. Reddy had not demonstrated that he was harmed "on account of" his political opinion is also supported by substantial evidence. There is nothing in the record to support the view that the land mafia opposed Mr. Reddy because of his TDP membership; indeed, Arjun himself also held a position of some authority in the party. Further, to the extent that the political opinion claim is based upon the withdrawal of police protection, again, the Board did not err in concluding that the record failed to establish that it was

---

[32] (...continued)

In *Pavlyk*, we rejected a proposed social group of "uncorrupt prosecutors" interested in "exposing government corruption." *Id.* at 1088. We noted that the petitioner had not presented evidence of vulnerability intrinsic to the proposed group; instead, the record suggested that "any persecution stemmed from his conduct in [two] particular investigations and not because of his status as a member of a group of prosecutors." *Id.* at 1088-89. The same is true of the record in this case. The land mafia's targeting of the petitioners was directly related to Mr. Reddy's testimony in the murder trial. The evidence he has presented does not show that *witnesses* against the land mafia are persecuted generally, or, indeed, that there have been any other prosecutions and witnesses.

In any event, the petitioners have forfeited any argument about this narrower social group formulation by failing to present it to the agency. Further, the en banc court recently heard argument in *Cece v. Holder*, No. 11-1989, on the meaning of the statutory term "particular social group" and related Board precedents, and we decline to wade into these waters unnecessarily in this case.

based upon Mr. Reddy's TDP membership. Although the change in the family's treatment by the authorities occurred following the replacement of the a local police official by the new Congress government, the IJ and Board both reasonably concluded that the decision not to post officers at the family home preemptively may have had "some other legitimate basis." A.R. at 258; *see also id*. at 342 ("[T]he poorly trained and underfunded police may have simply decided to direct scarce resources toward other needs in the community. . . . [T]he men he testified against were in jail. A reasonable, unbiased [police official] may have directed resources to more urgent needs. In fact, [Mr. Reddy] suggested that the protection that he received before May of 2004[] was due to his political connections.").

On review, the petitioners contend that the agency understated the change in treatment. In their view, the family was denied "the ordinary protection all citizens should be entitled to from the police," not merely any "special" privileges to police protection they received during the TDP's term in power. Pet'rs' Br. 21. As evidence, they cite the fact that, following the home invasion, his daughter attempted to make a police report, but when Mr. Reddy later inquired about the status of the investigation, he was told that no report had been made. Even if we were to conclude that this single incident involving the response of the police to the break-in constituted persecution, which we do not, the petitioners simply have not put forward sufficiently "compelling" evidence, "direct or circumstantial," that the police were motivated by his TDP membership. *See*

*Elias-Zacarias*, 502 U.S. at 483-84. The petitioners rely primarily on the timing of the change in treatment—that it occurred following the change in power. Although that is *permissible* evidence that could support an inference of political motive, it is certainly not so strong as to require the Board to have accepted it.[33] In short, this is simply not a case where "the factual circumstances alone may constitute sufficient circumstantial evidence of a persecutor's . . . motives." *Martinez-Buendia v. Holder*, 616 F.3d 711, 715 (7th Cir. 2010) (alteration in original) (internal quotation marks omitted); *cf. id.* at 717 (noting the existence of "uncontested evidence in the record" that the alleged persecuting group, the FARC, viewed members of petitioner's group "as political opponents").

---

[33] *See, e.g.*, *Bueso-Avila v. Holder*, 663 F.3d 934, 938 (7th Cir. 2011) ("The fact that some of the threats against Bueso-Avila occurred after church group meetings does not necessarily mean that the gang members were reacting to Bueso-Avila's religious beliefs[.] . . . Bueso-Avila's testimony that . . . the gang members persecuted him on account of these characteristics[] is an inference based on circumstantial evidence. Now this is a possible and legitimate inference to make. But we cannot say that this inference is supported by circumstantial evidence that is so compelling that no reasonable fact-finder could fail to find that the MS-13 gang was motivated to persecute Bueso-Avila on the basis of his religion or group membership." (internal quotation marks omitted)).

**B.  The Motion to Reopen**

In addition to their challenge to the underlying order of removal, the petitioners claim that the Board erred in denying their motion to reopen on the basis of ineffective assistance of counsel. We review the decision to deny a motion to reopen "for an abuse of discretion, upholding it unless it was made without rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *Marinov v. Holder*, 687 F.3d 365, 368 (7th Cir. 2012).

At the merits hearings, prior counsel did not offer the Reddys' daughter as a witness; following the removal orders issued by the IJ, prior counsel also elected not to appeal the IJ's denial of CAT relief to the BIA. Petitioners moved to reopen claiming that these decisions demonstrated that they had received ineffective assistance. The Board denied reopening upon concluding that, even if counsel's performance were deficient, the petitioners had not shown any prejudice. The petitioners, appropriately, do not dispute the Board's methodology,[34] but contend that its prejudice determinations were erroneous.

We begin with the CAT claim. The petitioners contend that the claim was "at least as strong as the asylum and withholding claims" because no nexus is

---

[34] To succeed on an ineffective assistance claim, the petitioners must demonstrate not only that counsel's performance was deficient, but that they "could have succeeded on the merits" of their claims, but for counsel's defective performance. *El-Gazawy v. Holder*, 690 F.3d 852, 860 (7th Cir. 2012).

required, and that was a principal failing identified by the agency in its denial of asylum and withholding. Pet'rs' Br. 11. This is not a correct statement of the burdens applicable in a CAT case as we have identified them: "Although the torture need not be on account of one of the enumerated traits required for asylum claims, the burden of proof for CAT protection is nonetheless *more stringent* than the burden for establishing asylum eligibility." *Hassan v. Holder*, 571 F.3d 631, 644 (7th Cir. 2009) (emphasis added) (internal quotation marks omitted). Because the asylum and withholding claims were denied on the grounds that the petitioners failed to establish *persecution* in addition to the failure to establish a nexus, it is simply incorrect to state that the CAT claim, which required a showing not merely of a likelihood of persecution, *but torture*, was on stronger footing than the other requests for relief. *Sarhan v. Holder*, 658 F.3d 649, 653 (7th Cir. 2011) ("Unlike the remedy of withholding of removal, relief under the CAT is not conditioned on proof that the alien has been persecuted because of one of the five grounds listed in the INA. On the other hand, the need to prove 'torture[]' . . . sets a high bar for relief.").

In any event, the Board decided the prejudice issue only on the ground that the petitioners "submitted insufficient evidence with their motion which would alter the Immigration Judge's finding that the [petitioners] could

safely relocate into another part of India,"[35] and it is this reasoning upon which the agency's decision must stand or fall, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (noting that a court cannot affirm an agency's inadequately justified decision "by substituting what it considers to be a more adequate or proper basis").

The petitioners claim that the agency committed numerous errors in arriving at its relocation finding: failing to consider Mr. Reddy's testimony about attempted relocation, failing to balance factors against the possibility of internal relocation under the CAT and improperly placing the burden to establish the unreasonableness of relocation on the petitioners.[36]

The objections, on the record before us, are without merit. Although it is certainly correct that relocation is not "reasonable" if it requires a petitioner to "live in

---

[35] A.R. at 4.

[36] Contrary to the petitioners' assertions that the Board did not "squarely discuss" relocation, Pet'rs' Br. 15, the Board specifically held in its original order dismissing the appeal that "[t]he Immigration Judge correctly determined that the [petitioners] fear a small number of criminals, that their account indicates that the police are capable of protecting the public, and that the [petitioners] may relocate to avoid any future problems." A.R. at 258; *see also id.* (noting that the petitioners "failed to meet their burden of establishing a well-founded fear of future persecution by showing a reasonable possibility of persecution that cannot be avoided by reasonably relocating within[] their home country given the local nature of the 'land mafia' criminals").

hiding," *see, e.g., Sarhan*, 658 F.3d at 661, the record does not require the conclusion that this was Mr. Reddy's fate. The IJ considered Mr. Reddy's testimony and determined that, on the salient points, he was not credible, in part because there was no objective evidence in the record to support his assertion of the land mafia's nationwide reach. Moreover, because we already have held that the finding of a lack of past persecution was supported by the record, it was not error to require the petitioners to bear the burden of proving that relocation was unreasonable. *See Rashiah v. Ashcroft*, 388 F.3d 1126, 1132 (7th Cir. 2004) (assuming that the burden-shifting framework applies in CAT cases, holding that an IJ did not err in holding the burden to the petitioners where she "explicitly found that petitioner had not presented evidence establishing past persecution or a well-founded fear of future persecution"); *cf. Perez-Ramirez v. Holder*, 648 F.3d 953, 958 (9th Cir. 2011) (shifting the burden on relocation in a CAT claim where the IJ specifically found that the past treatment the alien suffered constituted torture).

The petitioners also claim that the IJ erred in failing to consider relocation as only one piece of a broader CAT inquiry. The regulations direct that the agency consider "all evidence relevant to the possibility of future torture," and provide a non-exclusive list including the possibility of internal relocation among

other factors. *See* 8 C.F.R. § 1208.16(c)(3)(i)-(iv).[37] We agree with the petitioners that CAT claims are to be treated under this multi-factor analysis and that the Board's decision in this case, brief as it is on this topic, does not make clear that it used this approach. Nevertheless, we must read this section of the opinion in context. Although there is no other specific, stated finding on CAT relief, in the context of evaluating the petitioners' other claims, the Board already had concluded that the past treatment that the petitioners had suffered did not reach the level of persecution. A fair reading of the Board's opinion, therefore, is that the petitioners also did not establish that they had been tortured in the past. *See*

---

[37] Subsection 1208.16(c)(3) of Title 8 of the Code of Federal Regulations provides:

> (3) In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
>
> > (i) Evidence of past torture inflicted upon the applicant;
> >
> > (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
> >
> > (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
> >
> > (iv) Other relevant information regarding conditions in the country of removal.

*Nuru v. Gonzales*, 404 F.3d 1207, 1225 (9th Cir. 2005) ("[Torture] is *a fortiori* conduct that reaches the level of persecution."). In this context, with these two critical findings against the petitioners, it was not error for the Board to deny reopening on the basis that they were not prejudiced by the failure of prior counsel to pursue a CAT claim on appeal.

The petitioners also claim that ineffective assistance is demonstrated by the failure to present their daughter's testimony in the removal hearing. The petitioners acknowledge that the daughter's testimony could not alter the nexus finding and therefore would not have affected the asylum and withholding decisions. They claim, however, that it should have been presented to support the CAT claim. Given its content, we cannot conclude that the daughter's testimony would have established *torture*, or, as the Board found, that it would have affected the relocation analysis. Under these circumstances, the Board did not err in concluding that the failure to present the daughter was not prejudicial to the CAT claim.

## Conclusion

The petitioners have not presented evidence that would require a factfinder to conclude that they were subjected to past persecution or that any harm they suffered was on account of a statutorily protected ground. Accordingly, we deny the petition for review with respect to their underlying removal order. Further, the Board did not irrationally deny their motion to

reopen on the basis of ineffective assistance because the petitioners have not established prejudice from any of counsel's actions.

PETITIONS DENIED