In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3327

IVANKA STANOJKOVA, *et al.*,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of a Decision of
the Board of Immigration Appeals.
Nos. A095-930-601 & A095-930-602

ARGUED JUNE 14, 2011—DECIDED JULY 14, 2011

Before POSNER, ROVNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. One of the nations that emerged from the breakup of Yugoslavia was Macedonia. Ethnically it is mostly Slavic, but about a quarter of the population is Albanian. Albanian extremists began an insurrection in January 2001; it petered out after Macedonia agreed, in the "Ohrid Framework Agreement," signed in August, to grant greater rights to the Albanian

minority. See, e.g., Julie Kim, "Macedonia: Country Background and Recent Conflict" (Congressional Research Service, CRS Report for Congress, March 28, 2002), http://congressionalresearch.com/RL30900/document. php?study=Macedonia+Country+Background+and+ Recent+Conflict (visited June 29, 2011). Some violence persisted into the fall, and both sides accused the other of human rights violations. A State Department country report for 2002, entitled "Macedonia, the Former Yugoslav Republic of," March 31, 2003, http://www.state.gov/g/drl/ rls/hrrpt/2002/18379.htm (visited June 29, 2011), recounts extensive human rights violations by government forces, including a paramilitary police unit known as the "Lions."

The petitioners, Gjorgji Naumov and his wife, Ivanka Stanojkova, are Macedonian Slavs. In 2001 Naumov was drafted into the Macedonian Army. He refused to report for duty, because he disapproved of the government's effort to suppress Albanian demands for greater rights; he thought the demands justified.

On July 2, 2002, when Naumov and his wife, who had just learned she was pregnant, were living with his parents, three men broke into the home. It was midnight and they were armed, masked, and dressed in black. They rendered the parents unconscious with a chemical spray. One of the assailants held a gun to Naumov's head and explained that he and his companions had broken into the Naumov home because Naumov and his wife were "against the Macedonians" and "betrayers of Macedonia" and Naumov "did not participate in the war" (that is, the suppression of the Albanians' insurrec-

tion). Another of the assailants ripped open the wife's pajama top and fondled her breasts. He told her he could do to her whatever he wanted to do. He touched and grabbed her "all over her body" as she cried. When her husband told the assailants that his wife was pregnant, one of them replied that he was not "man enough to have Macedonian kids." Naumov tried to defend his wife but his attacker beat him on the head and back with his gun, causing bruises and swelling. When his wife's assailant tried to rip off her pajama bottoms she screamed very loudly, whereupon all three attackers left—though not before taking the Naumovs' money and jewelry. She was afraid she would lose the baby, and visited her doctor the next day; he found nothing wrong, and the pregnancy proceeded normally.

The police—whom Naumov had called as soon as the attackers left—didn't arrive until six hours later. They told him the assailants were "Lions," the implication being that the ordinary police, the police who had come in response to Naumov's call, couldn't protect the Naumovs because the Lions were fellow police, presumably more influential than ordinary police because of their paramilitary character. So two days after the attack the Naumovs fled the country. Eventually they came to the United States, but without a visa. Removal proceedings were instituted. The couple asked for asylum and other relief, but the immigration judge denied all relief and ordered them removed to Macedonia. The Board of Immigration Appeals affirmed in a perfunctory opinion by a "panel" consisting of one member of the Board.

The petitioners missed their deadline for seeking asylum, but remain eligible for withholding of removal and for deferral of removal on account of torture, although they do not press the torture claim, so we'll ignore it.

Withholding of removal (8 U.S.C. § 1231(b)(3)) requires a determination that the applicant (in this case applicants) will more likely than not be subjected to persecution if removed from the United States. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987); *Toure v. Holder*, 624 F.3d 422, 428 (7th Cir. 2010); *Quao Lin Dong v. U.S. Attorney General*, 638 F.3d 223, 228 (3d Cir. 2011). A finding of past persecution creates a rebuttable presumption of future persecution. 8 C.F.R. §§ 208.16(b)(1)(i), 1208.16(b)(1)(i). The Naumovs rely on the presumption.

The immigration judge, seconded by the Board member, ruled that the presumption was inapplicable because, they concluded, the Naumovs had not been persecuted. The immigration judge began his analysis by expressing doubt that Naumov's refusal to report for military duty had been politically motivated. Why that would matter is unclear; the Lions were angry that he had refused to fight the Albanians—*why* he had refused would not have interested them. In any event the judge's reasoning was garbled. He said:

> It is the understanding of this Judge that Gjorgji Naumov refused to report, in part, because he indicated that he did not believe in the mission of the army at the time. He indicated that he was not in-

terested in going to war. However, it is not entirely clear what Mr. Naumov was reporting to. Mr. Naumov did not indicate at the time that individuals were being forced to fight against other countries. If Mr. Naumov did not want to bear arms in support of the Macedonian government to quell any uprising by ethnic Albanians, it is not entirely clear to this Judge. However, there is no evidence in the record to show that Macedonia, back in 2001, was conducting any type of human rights abuses or atrocities, including any genocide. There were ethnic disturbances, however, after having reviewed the respondent's testimony and considered the evidence in this case, it is the assessment of this Judge that the government of Macedonia had a right to have him report to military service.

The statement that there is no evidence of human rights abuses by the Macedonian army in 2001 ignores the State Department's country report, though the report was not contradicted. (The member of the Board of Immigration Appeals who reviewed the judge's decision missed the error, glaring though it was.) What the immigration judge meant when he said "it is not entirely clear what Mr. Naumov was reporting to" we can't fathom; nor his reference to Naumov's "being forced to fight against other countries." The Board member made no attempt at clarification.

As for the Lions, the immigration judge resorted to the kind of warped logic that mars so many opinions of immigration judges and members of the Board of Immigra-

tion Appeals, by saying that if the police were in cahoots with the Lions "it would defy logic for them to come to the [Naumovs'] home at 6:00 a.m. in the morning following the attack and investigate the crime." No one had suggested that the attack was pursuant to a conspiracy between the local police and the Lions; the claim was that the authorities were not going to apprehend the attackers or protect the Naumovs because the ordinary police had no authority over the Lions.

Although the immigration judge said that "conclusions raised by Mr. Naumov that his refusal to be conscripted into the military a second time resulted directly in him and his wife being the victim of a home invasion, is [*sic*] not credible," the judge had previously remarked noncommittally that "eventually, according to [Naumov's wife], the testimony came back to [Naumov's] purportedly being an individual who refused to report for military service." (No "purported" about it; no one has questioned that he had refused to report.) The only sense we can make of this muddy sentence is that the judge believed the wife's testimony that the assailants attributed their "home invasion" to Naumov's having refused to report for military service.

And finally the judge ruled that the Naumovs had not been subjected to the minimum amount of harm required for a finding of persecution. The entire assault had lasted only 10 minutes. The injuries to Naumov's head had not required hospitalization but only a visit to the doctor. True, the wife was "slapped by an open hand and had her pajama top ripped. She had undergarments

below but this was not after being further insulted by having the attacker grope her, including her breasts, her legs, and other areas of her body. As distasteful as it is to weigh the facts in a particular case, it cannot be said that this 10-minute unfortunate incident is as compelling as an individual who has been jailed for two weeks in a tiny cell, denied adequate food and water, and losing two teeth as a result of police beatings," or even a case in which a person "was detained with three days with minimal food and beaten until he [*sic*] face was swollen." As near as we can tell from this awful prose, the reference to "this 10-minute unfortunate incident" is to both the beating of Naumov and the assault on his wife. We haven't a clue to what the judge meant by saying that "she had undergarments below but this was not after being further insulted . . . ." The judge didn't mention that the wife's parents had been knocked out.

The member of the Board of Immigration Appeals who constituted the appellate tribunal said that he would "not reach the question of the [Naumovs'] credibility," by which he seems to have meant their credibility concerning Naumov's motive in refusing to report for military service and the attackers' motive in attacking him and his wife and whether the attackers were Lions. At the end of his opinion he said that "we [the royal 'we'] deem them [the Naumovs] credible." He affirmed the immigration judge's decision on the ground, unrelated to credibility, that the "harm suffered during their home invasion does not rise to the level of persecution." That determination is central to the appeal to us.

Neither the Board member nor the immigration judge made any effort to specify the amount of harm required for the infliction of harm on members of an ethnic, political, religious, or other group to rise to the level of persecution. Nor can we find a useful definition in opinions by the Board (no regulation addresses the issue either) or by the courts, although the importance of distinguishing between harassment and persecution has been noted. See, e.g., *Gomes v. Gonzales*, 473 F.3d 746, 753-54 (7th Cir. 2007); *Baba v. Holder*, 569 F.3d 79, 85 (2d Cir. 2009). In terms of outcome the cases are all over the lot. See, e.g., Marra Guttenplan, Note, "Granting Asylum to Persecuted Afghan Western Women," 12 *Cardozo J.L. & Gender* 391, 395-96 (2005). Both sides of the present case are able to cite cases that support their position; we will spare the reader these citations, which cancel each other out.

A useful way to approach the definitional question is to distinguish among three forms of oppressive behavior toward a group despised by the government or by powerful groups that the government can't or won't control. The three forms are discrimination, harassment, and persecution. The first refers to unequal treatment, and is illustrated historically by India's caste system and the Jim Crow laws in the southern U.S. states. Discrimination normally does not involve the application of physical force, except as punishment for violation of the discriminatory laws.

Harassment involves targeting members of a specified group for adverse treatment, but without the application of significant physical force. Had Lions furious at

Naumov's being soft on Albanians followed his taxi (he was a taxicab driver in Macedonia) and ticketed him whenever he exceeded the speed limit by one mile per hour, that would be an example of harassment. A common form of sexual harassment is pestering a subordinate for a date or making lewd comments on her appearance, or perhaps hugging her, which is physical but generally not violent.

Persecution involves, we suggest, the use of *significant* physical force against a person's body, or the infliction of comparable physical harm without direct application of force (locking a person in a cell and starving him would be an example), or nonphysical harm of equal gravity—that last qualification is important because refusing to allow a person to practice his religion is a common form of persecution even though the only harm it causes is psychological. Another example of persecution that does not involve actual physical contact is a credible threat to inflict grave physical harm, as in pointing a gun at a person's head and pulling the trigger but unbeknownst to the victim the gun is not loaded.

The line between harassment and persecution is the line between the nasty and the barbaric, or alternatively between wishing you were living in another country and being so desperate that you flee without any assurance of being given refuge in any other country. (There is no suggestion that the Naumovs would have left their country had they not been attacked by Lions.) The line was crossed here. It requires only a little bit of imagination to put oneself in the place of the Naumovs—robbed;

one beaten over the head with a pistol and the other pregnant and sexually molested; her parents rendered unconscious by the assailants' chemical spray; the police unable or unwilling to arrest the assailants because they have the support of the government; and the principal intended victim—Naumov—unable to square himself with his persecutors because he is just a taxi driver in a small town and they have taken his valuables, so he can't bribe them to lay off him and his wife and her parents. Why would anyone hang around in Macedonia after that if there was any way out?

What the opinions of the Board member and immigration judge come down to is that one can imagine worse mistreatment than the Naumovs underwent. That is not a reasoned basis for rejecting a claim of persecution. See *Baba v. Holder, supra*, 569 F.3d at 86; *Benyamin v. Holder*, 579 F.3d 970, 975-76 (9th Cir. 2009). What happened to the Naumovs was bad enough; and between what happened and mere harassment—Lions shouting "Albanian lover" at Naumov outside his home or whistling at Mrs. Naumov—is a gap large enough to require classifying what the Lions did to them as persecution rather than harassment.

We are mindful that the primary responsibility for defining persecution, including the amount of harm that distinguishes it from infliction of the lesser harms that we have called harassment and discrimination, is the Board's rather than the courts'. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999); *Sahi v. Gonzales*, 416 F.3d 587, 588 (7th Cir. 2005). But it is a responsibility that the Board has abandoned to the courts. *Sahi v. Gonzales*,

*supra*, 416 F.3d at 588-89; *Gomes v. Gonzales, supra*, 473 F.3d at 753-54.

Many years ago the Board did attempt a definition of persecution: "harm or suffering that is inflicted upon an individual in order to punish him for possessing a belief or characteristic a persecutor seeks to overcome." *In re Acosta*, 19 I. & N. Dec. 211, 211 (BIA 1985), overruled on other grounds by *In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). The definition was vacuous with regard to the minimum amount of harm required; and since then the Board's approach, which reviewing courts have tended to mirror, has continued to be of the "I know it when I see it" variety. See, e.g., *Rodriguez-Roman v. INS*, 98 F.3d 416, 431 (9th Cir. 1996). The result, well illustrated by the administrative opinions in this case, is capricious adjudication at both the administrative and judicial level, generating extraordinary variance both in grants of asylum in similar cases at the administrative level and in reversals by courts of appeals of denials, as documented in Jaya Ramji-Nogales, et al., *Refugee Roulette: Disparities in Asylum Adjudication and Proposals for Reform* (2009). Responsibility has by default devolved on the courts (though without their achieving consensus, see, e.g., *Li v. Attorney General*, 400 F.3d 157, 170-72 (3d Cir. 2005) (dissenting opinion)), yet only provisionally—only until the Board assumes the responsibility—to try to create some minimum coherence in the adjudication of claims of persecution, as we have tried to do in this opinion.

However, the Albanian insurrection in Macedonia is now a decade in the past; Macedonia is a candidate for EU membership; and although misconduct by Macedonian

police is by no means entirely a thing of the past, see U.S. Dept. of State, "2009 Human Rights Report: Macedonia," March 11, 2010, www.state.gov/g/drl/rls/hrrpt/2009/eur/ 136044.htm (visited June 29, 2011), there appears to be much less than at the time of the assaults against the Naumovs; the contrast between the 2010 and 2003 State Department country reports is striking. There may well be less than a 50 percent probability that the Naumovs would be persecuted if returned to Macedonia, which, as noted earlier in this opinion, is the ultimate issue in a withholding of removal case. But changed conditions and the risk of future persecution were not addressed by the Board or the immigration judge, and remain for consideration on remand.

The petition for review is granted and the case remanded to the Board of Immigration Appeals for further proceedings consistent with this opinion.