# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 12-2320

VICTOR SIRBU AND IULIA PRODAN,

*Petitioners*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A088-390-329 & A088-390-330.

ARGUED JANUARY 29, 2013—DECIDED MAY 20, 2013

Before BAUER, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Moldovan citizens Victor Sirbu and his wife Iulia Prodan applied for asylum in the United States, as well as for withholding of removal and protection under the Convention Against Torture. Sirbu fears persecution by the Moldovan government based on his active and vocal opposition to the Communist Party. (Although the evidence indicates mistreat-

ment of both Mr. Sirbu and Ms. Prodan for their anti-Communist political activities, Mr. Sirbu's application is the lead one; Ms. Prodan's application is derivative of his.) An immigration judge denied relief, finding that Sirbu's evidence did not "compel a finding" of past persecution that could support asylum. The Board of Immigration Appeals affirmed the denial. Sirbu and Prodan have petitioned for review. Because the immigration judge and then the Board applied the wrong legal standard in deciding whether Sirbu had shown past persecution for his political activities, we grant the petition for review and remand the case for further proceedings.

I. *Factual and Procedural Background*

Sirbu and Prodan entered the United States as non-immigrant tourists in 2009 and overstayed their visas. They then filed a timely application for asylum, withholding of removal, and relief under the Convention Against Torture. The government responded by charging Sirbu and Prodan as removable for overstaying their visas. See 8 U.S.C. § 1227(a)(1)(B). The couple admitted removability before an immigration judge in February 2010, and Sirbu renewed their application for asylum and related relief.

Sirbu's persecution claim is based on politically motivated mistreatment that occurred in Moldova between 2000 and 2009. In 2001, the Moldovan Communist Party won the presidency and more than two-thirds of the seats in parliament. Moldovan security forces began

to harass, detain, and beat members of opposition parties. See U.S. Department of State, 2008 Country Reports on Human Rights Practices: Moldova (Feb. 25, 2009).

Sirbu was an active opponent of the Communist Party and was a victim of this political harassment and violence on several occasions, three of them in 2003. In January 2003, Sirbu participated in a large protest urging that Moldova join NATO and the European Union. He was arrested and detained for five hours. The next two encounters were violent. In February 2003, Sirbu participated in another anti-Communist protest. Two policemen hit him on the legs so sharply that he fell to the ground. He was then detained for about 40 hours without food or water. And in November 2003, police caught Sirbu participating in an anti-Communist Party meeting, struck him in the back, knocked him to the ground, and then detained and interrogated him overnight.[1]

In the following years, Sirbu experienced further political harassment and mistreatment, including the loss of his job, but was not deterred from political activity. For our purposes, we focus on the most serious incident, which finally led Sirbu and Prodan to leave Moldova and later to seek asylum in the United States. Moldova held parliamentary elections on April 5, 2009. Both Sirbu and Prodan ran as candidates for parliament

---

[1] Since the immigration judge made no adverse credibility finding, our account of the facts specific to Sirbu is based largely on his written and oral testimony.

in opposition to Communist Party candidates. The Communist Party claimed victory, but on April 7, Sirbu and Prodan joined a large protest in the nation's capital accusing the Communist Party of voter fraud. The protestors began to riot and the police arrested 300 people. See Protests in Moldova Explode, With Help of Twitter, NY Times (Apr. 7, 2009), http://www.nytimes.com/ 2009/04/08/world/europe/08moldova.html?pagewanted= all. Both Sirbu and Prodan were arrested and taken to a police station. While in police custody Sirbu was hit frequently on the head until he lost consciousness. Several other detainees died in custody after the protest and arrests. The police transferred Sirbu and Prodan to a police station in their hometown, and Sirbu was treated at a medical clinic for a concussion. They left for the United States later in April 2009.

After their departure from Moldova, Sirbu said, the police went to his parents' home and told them he was on a "black list." At the removal hearing Sirbu testified that he still feared returning to Moldova because many Communists still held positions of power even though opposition parties had won a narrow victory in new elections in July 2009 prompted by the April protests.[2]

---

[2] See Communists Lose in Moldova Vote, NY Times (July 30, 2009), http://www.nytimes.com/2009/07/31/world/europe/ 31moldova.html?scp=16&sq=&st=nyt. Four opposition parties formed a new majority coalition that continues to govern Moldova. See CIA World Factbook, *available at* https:// www.cia.gov/library/publications/the-world-factbook/ geos/md.html (last visited May 16, 2013).

The immigration judge denied Sirbu's application for asylum. The judge explained: "After careful consideration of the record in its entirety, and considering all the incidents in the aggregate, [Sirbu's] facts do not *compel* a finding that he suffered past persecution." App. 9 (emphasis added). According to the immigration judge, Sirbu's detentions were brief, he reported a physical injury resulting from only one of them (when he was beaten unconscious in April 2009), and after each incident he was able to pursue his anti-Communist political activities. Nor did Sirbu show a well-founded fear of future persecution, the judge concluded, because he did not corroborate his assertion about being on a police black list, the July 2009 elections had unseated the Communist Party president, and opposition parties had formed a strong coalition. Because Sirbu was ineligible for asylum, the judge concluded, he also failed to meet the higher standards for withholding of removal or Convention Against Torture protection.

The Board agreed with the immigration judge that Sirbu had "not met his burden of proof to establish that he suffered past persecution" and dismissed Sirbu's appeal. In reaching this conclusion, the Board cited our decision in *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011), for the proposition that persecution involves "the use of *significant* physical force against a person's body, or the infliction of comparable physical harm without direct application of force . . . or non-physical harm of equal gravity." The Board acknowledged that Sirbu had been beaten but noted he had sought medical treatment only once. In an important passage,

the Board acknowledged that an applicant for asylum need not prove "serious injuries," citing *Asani v. INS*, 154 F.3d 719, 722-24 (7th Cir. 1998), but found that Sirbu's abuse did not rise to the level suffered in *Asani*. The Board found, instead, that the abuse of Sirbu was more comparable to the abuse in *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003), which the Board described as having upheld a finding of no past persecution where the applicant had been detained for three days without food or water and had been beaten. The Board did not address the issue of fear of future persecution, including whether, if past persecution had been shown, the government had shown political changes in Moldova sufficient to rebut the inference of reasonable fear of future persecution.

## II. *Discussion*

In his petition for judicial review, Sirbu argues that the Board erred in concluding that he failed to establish that he suffered past persecution. He believes that his testimony and the documentary evidence show that he was persecuted for being politically active and for expressing his anti-Communist opinions and that he reasonably fears persecution if he were returned to Moldova.

Where the Board has agreed with the immigration judge's decision and supplemented that opinion with its own observations, as it did here, we review both decisions. See *Sarhan v. Holder*, 658 F.3d 649, 653 (7th

Cir. 2011). We have reviewed both decisions and Sirbu's evidence.

The immigration judge made a clear legal error by concluding that the "facts do not compel a finding that he suffered past persecution." As the government acknowledged in the oral argument, whether the facts *compel* a finding of past persecution is the standard for judicial review, not for the immigration judge in the first instance. We expect the immigration judge and the Board to exercise their independent judgment and expertise in deciding whether the abuse of an applicant for asylum rose to the level of persecution.

The Board appears to have repeated the immigration judge's legal error. Though the Board did not say explicitly that the facts would not compel a finding of past persecution, the Board distinguished on factual grounds a case in which we had reversed a finding of no past persecution and held that the facts were indeed so powerful as to "compel" a finding of past persecution. App. 24, citing *Asani*, 154 F.3d at 722-24. The Board then found guidance from our decision in *Dandan* in which we held that the abuse of the petitioner in police custody was not so severe as to "compel" a finding of past persecution. App. 24, citing *Dandan*, 339 F.3d at 573-74. The Board also did not acknowledge the immigration judge's legal error. The combination of the immigration judge's application of the wrong standard, the Board's failure to note the error, and the Board's citations to *Asani* and *Dandan* persuades us that the Board applied the wrong legal standard.

The proper issue for the immigration judge and the Board is whether the applicant has *actually* shown past persecution, not whether the evidence *compels* a finding of past persecution. The difference may seem subtle, but it is actually vital in administering the law of asylum. Whether the facts *compel* a particular finding is a matter for appellate courts to determine in our deferential review of the Board's decisions. See *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Bueso-Avila v. Holder*, 663 F.3d 934, 937 (7th Cir. 2011); *Matter of E-R-M-F- & A-S-M-,* 25 I. & N. Dec. 580, 587 n.8 (BIA 2011). Our standard of review for factual questions is substantial evidence: "the agency's determination will stand if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Vahora v. Holder*, 626 F.3d 907, 912 (7th Cir. 2010); see *Elias-Zacarias*, 502 U.S. at 481.

We defer to the immigration judges and the Board because we expect them to exercise their expertise and judgment in the difficult cases. In cases like this one, though, where the Board and the immigration judge misread our decisions denying review because the evidence did not compel a finding of persecution as holding that the evidence either did not or could not support a finding of persecution, the proper roles of agency and reviewing court have been reversed.

That has happened too often. As we explained in *Stanojkova v. Holder*, the Board's regulations and decisions do not provide a useful definition of persecution, and the Board seems to have abandoned this difficult

responsibility to the courts. 645 F.3d 943, 948-49 (7th Cir. 2011), citing *Sahi v. Gonzales*, 416 F.3d 587, 588-89 (7th Cir. 2005), and *Gomes v. Gonzales*, 473 F.3d 746, 753-54 (7th Cir. 2007).

Our cases reviewing denials of asylum can read like grim exercises in measuring the precise extent of human cruelty and misery. We try to distinguish between harassment and persecution, "between the nasty and the barbaric." *Stanojkova*, 645 F.3d at 948. How many times was the victim beaten? How severe were the beatings? Were bones broken? Did the victim lose consciousness? How many teeth were knocked out? Were there permanent injuries or scarring? How serious were the threats, and how cruelly were they communicated? That grim accounting cannot be avoided. Because of the deferential standard of review, our job in these cases is ordinarily to decide whether the evidence would *compel* any reasonable trier of fact to find that prior abuse of the petitioners amounted to persecution within the meaning of the law.[3]

---

[3] Our cases illustrate this fine parsing of misery and cruelty. For cases reversing findings of no past persecution, see, *e.g.*, *Stanojkova*, 645 F.3d at 947-48 (paramilitary police invaded home, beat applicant and held gun to his head, sexually fondled his wife, and robbed the couple); *Vladimirova v. Ashcroft*, 377 F.3d 690, 692 (7th Cir. 2004) (one beating caused miscarriage, and applicant suffered two other physical assaults and detentions and was threatened with sexual assault); *Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003) (applicant was

(continued...)

---

[3] (...continued)
beaten on four occasions, his face was cut with a razor, and he was forced to watch his wife being raped); *Begzatowski v. INS*, 278 F.3d 665, 670 (7th Cir. 2002) (ethnic Albanian soldiers in Serbian army were forced into battle as human shields without ammunition and tools needed for survival); *Asani*, 154 F.3d at 721 (applicant was detained in cell for two weeks with only enough room to stand handcuffed to radiator, was given one slice of bread and one glass of water a day, lost his job, and was later detained again and beaten, losing two teeth). Compare those to the following cases affirming findings of no past persecution: *Nzeve v. Holder*, 582 F.3d 678, 683-84 (7th Cir. 2009) (applicant suffered blisters and bruises and was threatened with death); *Mema v. Gonzales*, 474 F.3d 412, 416-18 (7th Cir. 2007) (applicant was beaten unconscious while in detention, but denial of asylum was reversed for failure to address fear of future persecution); *Bejko v. Gonzales*, 468 F.3d 482, 485 (7th Cir. 2006) (applicant was detained twice, once for two weeks in primitive conditions without enough food and water, but without need for medical treatment, and applicant was threatened that house would be blown up); *Zhu v. Gonzales*, 465 F.3d 316, 319 (7th Cir. 2006) (one beating with head injury requiring stitches); *Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (applicant was interrogated, searched, and detained for 24 hours, arrested, and threatened with unspecified injury); *Dandan*, 339 F.3d at 573-74 (applicant was detained for three days without food, interrogated, and beaten resulting in a swollen face); *Yadegar-Sargis v. INS*, 297 F.3d 596, 602 (7th Cir. 2002) (harassment and hardship did not show persecution; applicant had not been detained or physically assaulted); *Skalak v. INS*, 944 F.2d 364,

(continued...)

In the close cases, where a reasonable trier of fact could make a decision either way, we should be able to defer to the judgment of the immigration judges and the Board. But the immigration judges and the Board turn the system upside down if they use our deferential decisions as setting new, lower floors for human cruelty than our immigration law says must be tolerated without granting asylum. That is what has happened in this case. It was a reversible error of law and the case must be remanded.

We express no opinion at this time on whether the incidents Sirbu described are severe enough to *compel* a finding of past persecution. On remand, though, the Board will need to consider all the evidence of persecution and in particular will need to address the significance of Sirbu's testimony that he was beaten to the point of losing consciousness and suffering a concussion while in police custody. We are confident that this evidence is more than sufficient to support a finding of past persecution. See *Stanojkova*, 645 F.3d at 948 (use of significant physical force against a person's body is persecution); *Bevc v. INS*, 47 F.3d 907, 910 (7th Cir. 1995) (applicant for asylum must show "specific, detailed facts supporting the reasonableness of her fear that she will be singled out for persecution").

---

[3] (...continued)
365 (7th Cir. 1991) (applicant was jailed twice for three days and interrogated about political activity); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990) (applicant was detained and interrogated several times and suffered economic losses but was not physically abused).

If the Board concludes that Sirbu has demonstrated past persecution, the burden will shift to the government to prove that changed circumstances mean that Sirbu's fear of persecution in Moldova is no longer well-founded. See 8 C.F.R. § 208.13(b)(1)(ii). The Board did not address that issue, and we also do not address it at this stage. We GRANT the petition for review and REMAND the case for further proceedings consistent with this opinion.