In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3651

KATSIARYNA SOBALEVA and ALEXANDRU POTORAC,

*Petitioners,*

*v.*

ERIC HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of a Decision
of the Board of Immigration Appeals.
Nos. A200-981-396 & A200-981-397.

ARGUED APRIL 1, 2014 — DECIDED JULY 24, 2014

Before TINDER and HAMILTON, *Circuit Judges*, and
KAPALA, *District Judge.**

HAMILTON, *Circuit Judge*. Petitioner Katsiaryna Sobaleva,
a citizen of Belarus, entered the United States on a valid stu-
dent visa. She applied for asylum, contending that the Bela-

---

* Of the Northern District of Illinois, sitting by designation.

rusian government persecuted her for her political opinion before she left and likely would do so again if she were to return. She also requested asylum for her husband, Alexandru Potorac, a citizen of Moldova. (Because Potorac's eligibility for asylum derives entirely from Sobaleva's, it does not require separate consideration.) An immigration judge denied Sobaleva's application and ordered that she and Potorac be removed to their respective countries. The Board of Immigration Appeals affirmed, explaining that Sobaleva had not established either past persecution based on her political opinion or a well-founded fear of future persecution.

Sobaleva and Potorac petition this court for review of the orders of removal. We conclude that two significant flaws in the decisions of both the immigration judge and the Board require that the petition be granted and the case remanded for further consideration. First, the judge and the Board applied the wrong legal standard to conclude that Sobaleva was not persecuted in Belarus. Second, both the judge and the Board misconstrued and disregarded important evidence, so that the decision to deny Sobaleva's application is not supported by a reasoned analysis.

I.   *Factual and Procedural Background*

In Belarus, Sobaleva belonged to a group called Malady Front (Young Front), a large youth organization opposed to the country's longtime authoritarian leader, Alexander Lukashenko. Malady Front and affiliated organizations like Young Belarus have been frequent targets of government crackdowns on dissent. See, e.g., U.S. Department of State, 2010 Human Rights Report: Belarus 3–8 (April 8, 2011) (describing the arrests and detentions of group members for their political activity); Amnesty International, 2007 Report

on Belarus (April 3, 2007) (ascribing the five-year prison sentence of Malady Front leader Alyaksandr Kazulin to a "systematic campaign of harassment, intimidation, and obstruction by the Belarusian authorities"). Conditions in Belarus have not improved since Sobaleva's departure in May 2010. See *Boika v. Holder*, 727 F.3d 735, 739 (7th Cir. 2013) (summarizing evidence that, since Lukashenko's disputed election in December 2010, the Belarusian government has been particularly aggressive toward opponents).

Sobaleva filed a timely application for asylum roughly nine months after her arrival in the United States. Her application described her participation in anti-government protests and her mistreatment by police in connection with two of them. A hearing on her application was held before an immigration judge.

In her testimony at the hearing and in an affidavit, Sobaleva recounted that police officers arrived at an October 2009 protest and began beating protesters indiscriminately. One officer hit Sobaleva hard in the face, knocking off her glasses and causing her nose to bleed. While she was bent over to retrieve the glasses, an officer grabbed her by the neck and shoved her into a police bus, where another officer hit her in the arm. Upon arriving at the police station, she was pushed out of the bus onto the ground.

Officers questioned Sobaleva inside the station about her political activities. She and five other arrestees were then placed in a cold cell designed to accommodate only two people. The detention lasted overnight for a total of about 15 hours. After her release, her mother tried to file a complaint about the incident but was turned away from the police station.

Sobaleva also testified that, on May 16, 2010, she had an-
other experience with politically motivated violence by po-
lice. While she and two fellow protesters were walking to-
gether after a demonstration, they were stopped by officers
who demanded identification. Although Sobaleva and her
companions had left the protest site, they were wearing pic-
tures of political prisoners on their shirts. Sobaleva testified
that it is not unusual in Belarus for police officers to request
identification but that, in this instance, after radioing in their
names for a check, an officer began copying information
from their passports into a report.

At that point, Sobaleva reached for her passport and
asked if she was under arrest. An officer responded by shov-
ing her against a building, knocking her unconscious. When
she regained consciousness, her friends told her that the of-
ficer had kicked her while she was on the ground. Nauseat-
ed and in pain, Sobaleva went to a medical clinic and was
diagnosed with a concussion, as documented by a doctor's
report in the record. The doctor recommended hospitaliza-
tion, but Sobaleva chose instead to go home, where she
stayed in bed for a week.

Soon after the incident, both of Sobaleva's companions
from the May 16 protest received notices to pay a fine. So-
baleva, however, received a summons to come to court on
June 10 "in the role of the accused." The summons identified
the case as "criminal" but did not indicate why Sobaleva was
being summoned or with what crime she had been charged.

Having left for the United States on May 31, Sobaleva did
not attend court on June 10. She could provide no direct evi-
dence at her asylum hearing that the summons concerned
the events of May 16, but she testified that she believes it did

because her companions from that day were fined and be-
cause she knows of no other reason she would have been
summoned. She believes that she received a summons in-
stead of being fined because she had previously been arrest-
ed for protesting—something the officers would have
learned when they radioed in the information from her
passport—and because she challenged them during the en-
counter.

According to Sobaleva's mother, whose detailed written
statement is also in the record, police officers came to her
house looking for Sobaleva on June 10 after she did not show
up in court. They have returned repeatedly since then and
have threatened that Sobaleva's absence could cost her
mother her job.

The immigration judge denied Sobaleva's application,
finding that her evidence, when compared with other cases
this court has decided, did not establish that she had been
persecuted for her political opinion or that she has a well-
founded fear of future persecution. Regarding her arrest in
October 2009, the judge observed that Sobaleva was held for
no more than 16 hours and "was not mistreated" during that
time. Additionally, Sobaleva herself did not "consider [the
2009] incident to be significant," which the judge inferred
from her continued political activity and her failure to men-
tion the incident when she applied for her visa at the U.S.
Embassy. Regarding the confrontation with police in May
2010, the judge said that Sobaleva did not "contend that she
was detained or seriously abused by the police in the inci-
dent." And the judge concluded that the summons she re-
ceived "standing alone" did not suggest that she would be
persecuted in the future.

The Board of Immigration Appeals affirmed. The Board accepted the judge's assessment that Sobaleva gave credible testimony, and we do the same. See *Ndonyi v. Mukasey*, 541 F.3d 702, 709 (7th Cir. 2008). The Board found, though, that the events she described and her supporting evidence were not enough to meet her burden of proof. Her treatment by police in and after the October 2009 protest was "condemnable" but "did not rise to the level of persecution" as shown by a comparison with the treatment of other asylum applicants in cases decided by this court. Regarding the May 2010 incident, which resulted in a concussion, the Board found that Sobaleva "did not meet her burden of showing that her political opinion was a central reason for the mistreatment she suffered." The Board also found that Sobaleva had failed to establish a connection between the court summons she received and her political activity.

II. *Analysis*

To be eligible for asylum, Sobaleva needed to establish either that she has suffered past persecution on account of her political opinion (or another protected ground) or that she has a well-founded fear of future persecution on a protected ground. See 8 U.S.C. § 1101(a)(42)(A); *N.L.A. v. Holder*, 744 F.3d 425, 431 (7th Cir. 2014). Past persecution raises a rebuttable presumption that the petitioner has a well-founded fear of future persecution. See 8 C.F.R. § 1208.13(b)(1); *N.L.A.*, 744 F.3d at 431. Sobaleva argues that the Board of Immigration Appeals and immigration judge misconstrued her evidence in numerous ways and failed to consider it in context. If properly considered, she contends, the evidence establishes that she was persecuted for her political opinion

and has a well-founded fear of future persecution, entitling her to asylum.

Because the Board provided its own analysis and also affirmed the immigration judge's decision, we review both decisions. See *Bathula v. Holder*, 723 F.3d 889, 897 (7th Cir. 2013). Our review of legal conclusions is *de novo*, and we review factual conclusions to determine whether they are supported by "substantial evidence." *Id.* at 897–98. We must ask whether the agency applied the proper legal standard in evaluating Sobaleva's application, see *Sirbu v. Holder*, 718 F.3d 655, 658 (7th Cir. 2013), and also whether the agency's conclusions are supported by a reasoned analysis of the evidence, see *Cece v. Holder*, 733 F.3d 662, 678 (7th Cir. 2013) (en banc). Only if the record "compels" a finding of past persecution or a well-founded fear of future persecution will we conclude on judicial review that the applicant is eligible for asylum. *Nzeve v. Holder*, 582 F.3d 678, 684 (7th Cir. 2009).

For two reasons, the decisions of the immigration judge and Board in this case cannot stand. We do not decide at this time whether the record actually compels a finding of persecution; rather, we conclude that the flaws we have identified require remand to the Board for further consideration of Sobaleva's application.

The first major flaw is that both the immigration judge and the Board apparently applied this court's standard for assessing persecution claims *on judicial review* rather than the standard that applies to their own judgments in the first instance. We held in a similar case, *Sirbu*, 718 F.3d at 658–60, that this is a legal error that requires remand.

The two standards for assessing evidence of persecution are distinct. As explained above, on judicial review of a denial of asylum, we ask whether the petitioner's evidence *compels* a finding of persecution. By contrast, the "proper issue for the immigration judge and the Board is whether the applicant has *actually* shown past persecution," which is a less demanding standard that calls for the agency to apply its expert judgment. *Id.* at 659.

In *Sirbu*, the immigration judge concluded that the asylum applicant's evidence did not "compel" a finding of persecution, and the Board, without using the word compel, "distinguished on factual grounds" our decision in *Asani v. INS*, 154 F.3d 719 (7th Cir. 1998), in which we "held that the facts were indeed so powerful as to 'compel' a finding of past persecution." 718 F.3d at 658. "The Board then found guidance from our decision in *Dandan* [*v. Ashcroft*, 339 F.3d 567 (7th Cir. 2003)] in which we held that the abuse of the petitioner in police custody was not so severe as to 'compel' a finding of past persecution." *Id.*; see *Asani*, 154 F.3d at 722–24 (7th Cir. 1998) (explaining that Board erred in concluding that petitioner was not seriously harmed by being detained for a week, being deprived of food, and having two of his teeth knocked out); *Dandan*, 339 F.3d at 574 ("A three-day interrogation resulting in a 'swollen' face does not compel us to conclude that the BIA was incorrect [in not finding past persecution]."). We concluded in *Sirbu* that the judge and the Board both had applied the appellate court standard for judicial review rather than making an independent determination. 718 F.3d at 658. We granted the petition for review for that reason and remanded the case for further consideration. *Id.* at 660.

As in *Sirbu*, the immigration judge and the Board in this case seem to have considered whether Sobaleva's evidence would compel a finding of persecution on judicial review rather than considering whether she was in fact persecuted. The immigration judge did not use the word compel, but in concluding that Sobaleva's treatment did not equal persecution, he said that her case "closely resembles the facts in *Dandan* and not the facts in *Asani*." This reliance on a simple comparison to our cases disregarded the fact that when we apply deferential judicial review, we "expect the immigration judge and the Board to exercise their independent judgment and expertise in deciding whether the abuse of an applicant for asylum rose to the level of persecution." *Sirbu*, 718 F.3d at 658. Facts that may not have compelled a finding of persecution in one case may nevertheless support such a finding in another case. The Board and immigration judges must keep in mind the difference between our standard and theirs when they assess evidence of persecution.

Rather than correcting the immigration judge's *Sirbu* error, the Board actually exacerbated the problem. It supported its conclusion that Sobaleva's "arrest and detention did not rise to the level of persecution" with a citation to *Nzeve v. Holder*, 582 F.3d 678 (7th Cir. 2009), followed by this parenthetical: "being beaten with batons, kicked, struck with the butt of a gun, and threatened does not compel holding that such harm rises to the level of persecution." This citation referring to compulsion suggests that the Board asked itself only whether the evidence compelled, rather than warranted, a finding of persecution. And an additional citation to *Stanojkova v. Holder*, 645 F.3d 943 (7th Cir. 2011), in which we held that a family's account of abuse by police compelled a finding of past persecution, does nothing to remove that im-

pression. In short, when citing this court's cases, the Board
must not assess an asylum applicant's evidence as this court
would on judicial review. Remand is necessary so that So-
baleva's evidence of persecution can be reassessed under the
proper standard. (Moreover, the mistreatment at issue in
*Nzeve* is distinguishable from Sobaleva's. The petitioner in
that case, who suffered some "blisters and bruises," was not
arrested after the assault. *Nzeve*, 582 F.3d at 683–84.)

The second major flaw in the immigration judge's and
Board's decisions is that neither gave due consideration to
the evidence Sobaleva presented. Both disregarded some ev-
idence, improperly isolated or mischaracterized other evi-
dence, and took logical leaps that do not withstand scrutiny.
"An asylum applicant is entitled to a reasoned analysis of her
case supported by relevant, probative evidence." *Cece*, 733
F.3d at 678. Where such analysis is lacking, remand for fur-
ther consideration is required. See *id.*; *Qiu Yun Chen v. Holder*,
715 F.3d 207, 214 (7th Cir. 2013) (remanding because Board's
mischaracterization of some evidence and disregard of other
evidence "depriv[ed] the Board's order denying asylum of a
rational foundation"); *Iao v. Gonzales*, 400 F.3d 530, 533 (7th
Cir. 2005) ("We do not decide that [the petitioner] is entitled
to asylum; that is a decision for the immigration authorities
to make. But she is entitled to a rational analysis of the evi-
dence by them.").

Again, our review for substantial evidence requires us to
ask whether the agency complied with its duty to provide a
reasoned analysis of that evidence. We conclude that it did
not. Our focus is primarily on the Board's decision, but a few
aspects of the immigration judge's decision bear mentioning
first.

In his description of Sobaleva's 2009 arrest and detention, the judge inexplicably ignored that she was hit twice and pushed to the ground. He also observed that Sobaleva did not think the 2009 incident was "significant," which is an observation unsupported by evidence. That she continued her political activities surely suggests commitment to the cause rather than the absence of persecution. The fact that she did not mention the incident to the U.S. Embassy seems a poor reason to conclude that she thought it was insignificant.

In then discussing the court summons Sobaleva received after the 2010 incident, the immigration judge observed that "standing alone" it did not establish a well-founded fear of future persecution. But of course it should not be considered standing alone. Standing alone, the unexplained court summons to answer an unspecified charge said little. In the context of Sobaleva's testimony, which was found credible, the summons takes on greater significance. And under the law, that evidence must be considered along with all the other evidence, including Sobaleva's past experience with the authorities and her mother's account of events since her departure. See *Chen v. Holder*, 604 F.3d 324, 334–35 (7th Cir. 2010) ("totality of evidence" must be considered in deciding persecution questions); *Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006) (explaining that "it is axiomatic that the evidence of persecution must be considered as a whole, rather than piecemeal").

The Board's decision includes the same type of errors. Most problematic is the Board's treatment of Sobaleva's May 2010 stop by police and her subsequent summons to court. In concluding that Sobaleva failed to meet her burden under 8 U.S.C. § 1158(b)(1)(B)(i) of showing that her political opin-

ion was "at least one central reason" for the May 2010 incident, the Board observed that she had left the protest site before the stop and that the police officers did not arrest her, did not mention her politics or tell her to cease her activities, and did not harm her friends. The officers behaved this way, the Board pointed out, despite the group's "apparent political activism" and known history of protesting. From this the Board concluded that the officers most likely mistreated Sobaleva simply because she reached for her passport.

The Board's characterization of the situation improperly discounted the context in which the stop took place as well as key facts suggesting that Sobaleva's political activity was a primary reason for her mistreatment. In *Ndonyi v. Mukasey*, 541 F.3d 702, 711 (7th Cir. 2008), we found error in the Board's conclusion that the petitioner was mistreated during a political protest not on account of her political opinion but "for disturbing the peace or for attempting to break into an administrative office." As the Board acknowledged here, Sobaleva's political activity was "apparent" and her arrest record was known to the officers. The Board should have considered the possibility that the officers "were partially motivated by politics." *Ndonyi*, 541 F.3d at 710–11.

The Board, however, concluded that the officers' more lenient treatment of Sobaleva's companions negated the possibility that her politics played a role in motivating the attack. We do not follow that reasoning. Sobaleva became the most vocal and resistant member of the group when her passport was not returned as it would have been during a routine stop. She also had been arrested and detained fairly recently. Both facts are consistent with the officers being motivated by her political opposition to the regime. The fact that the offic-

ers were content to give her a concussion without arresting her at the time does not suggest, as the Board reasoned, a non-political motive.

Further undermining the Board's assessment of the May 2010 incident is that Sobaleva received the court summons shortly thereafter. The Board conceded that the summons was likely connected to the May 2010 incident and that in Belarus "the judiciary succumbs to political interference." But the Board then found that Sobaleva had not shown "any improper basis for the summons," apparently reasoning that summoning her to court on mystery criminal charges after she was severely injured by an officer in response to having reached for her passport would be proper. Again, we do not understand the Board's reasoning. The fact that Sobaleva was quickly summoned to answer unknown charges only supports the idea that the unknown charges were based at least in part on her political activity.

 The Board went on to explain that the "fact that the respondent's friends received only fines undermines her claim that the summons is politically motivated." The conclusion does not follow. If Sobaleva's mistreatment was solely the result of her own behavior during the stop and not her political opinion, why were her companions fined? They did not misbehave. The Board did not attempt to answer that question.

Finally, the Board mentioned only in passing Sobaleva's mother's account of events since her daughter's departure, giving that account no apparent weight. But her mother's account is additional support for the idea that Sobaleva was not summoned to court simply because she reached for her passport. According to Sobaleva's mother, the police have

been diligent in seeking her daughter since the missed court date and have even threatened her with the loss of her job. This diligence and intensity surely seem greater than would be expected if the authorities viewed Sobaleva as merely a common disturber of the peace. Sobaleva's mother's account is relevant not only to whether the police had a political motive for Sobaleva's treatment in May 2010, but also to the critical question of how she would likely be treated if she were returned to Belarus. Ignoring evidence that relates to key issues is error. See *Qiu Yun Chen*, 715 F.3d at 212–13.

Taking all of this into account, we must conclude that Sobaleva did not receive a reasoned analysis of her evidence. She must be provided with one on remand. If the Board then concludes that the police officers were motivated by Sobaleva's political opinion during the May 2010 incident, it must consider whether the combination of that incident and her October 2009 arrest and detention amounts to past persecution. The Board must also take care on remand to reassess Sobaleva's eligibility for asylum independently, as directed by *Sirbu*.

The petition for review is GRANTED and the case is REMANDED to the Board of Immigration Appeals for further proceedings consistent with this opinion.