In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 18-2618

N.Y.C.C.,

*Petitioner,*

*v.*

WILLIAM P. BARR,
Attorney General of the United States,

*Respondent.*

———————————

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A000-000-000

———————————

ARGUED APRIL 16, 2019 — DECIDED JULY 19, 2019

———————————

Before EASTERBROOK, KANNE, and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. To obtain asylum in the United States, N.Y.C.C. needed to establish that she has faced past persecution or harbors a well-founded fear of future persecution based on her membership in a particular social group. An immigration judge determined that she fell short of making this showing and denied her application. The Board of Immigration Appeals agreed. N.Y.C.C. has now sought our review,

and she faces the difficult burden of showing that the record compels a different result. Seeing nothing in the record that required the immigration judge (or the Board) to conclude that N.Y.C.C. experienced past persecution or reasonably fears future persecution, we deny her petition.

**I**

N.Y.C.C., a citizen of Mexico, applied for asylum in December 2014. Her application led to a hearing before an immigration judge in September 2015, and there she testified and presented documents to support her petition, including an expert's report on the conditions in Mexico and written statements from family members.

N.Y.C.C. testified that she fled Mexico because of threats and harassment by her former partner, a man going by the initials E.G. and the father of one of her sons. N.Y.C.C. believes E.G. and his cohorts are members of the Mexican cartel known as La Familia Michoacana. She roots this view in observations she made while the two of them lived together during parts of 2011 and 2012. More specifically, N.Y.C.C. testified that E.G. had a large house despite working at a carwash and frequently stayed out late only to return home in different cars. He often hosted visitors at their home and held discussions he kept N.Y.C.C. from hearing. N.Y.C.C. testified that she once overheard a visitor mention "going to do the job now," and she believed this meant E.G. and his friends planned to kidnap someone. She also testified to finding a gun in their home. All of this caused N.Y.C.C. to believe E.G. and his friends belonged to the La Familia cartel.

N.Y.C.C. ended her relationship with E.G. in July 2012. She told the immigration judge that she did so because of his

suspicious behavior and her fear that opposing cartel members who wished to harm E.G. and La Familia might also end up harming her or her children. This fear, she added, led to her moving back into her mother's house about two hours away while she was nine months pregnant with E.G.'s child. E.G. reacted by telling her that she could leave if she wanted to.

For the next year or so, E.G. was not around much, only showing up in August 2012 when N.Y.C.C. contacted him to pay for the hospital expenses related to the birth of their child. He resurfaced in June 2013, when N.Y.C.C. began to see him occasionally drive by her home and the restaurant where she worked. She found this worrisome and believed E.G. was looking for her. On a few occasions he entered the restaurant to eat, one time telling N.Y.C.C. that she needed to move back in with him. N.Y.C.C. did not agree to do so, and E.G. reacted by threatening to take her sons away—"the bad way" if necessary. N.Y.C.C. explained that her supervisor observed these events and, aware that E.G. had been following N.Y.C.C., took her son (who was in the restaurant) into a bathroom to hide. E.G. left that day in anger but, as N.Y.C.C. recounted in her testimony, kept returning to the restaurant to look for her.

Following this confrontation in the restaurant, N.Y.C.C. moved to a different apartment outside of town. Despite doing so, she continued to see E.G. driving by her apartment late at night, often in different cars. She recalled one of the cars that had driven by her apartment also followed her to her son's school one day. N.Y.C.C. remembered another time when E.G. and some of his friends revved their engines outside her apartment and shined their car lights into her room.

N.Y.C.C. complained to the local police but was told there was nothing they could do. After the police offered no help, she fled to the United States with her children in December 2014. N.Y.C.C. has not spoken to E.G. since their confrontation in the restaurant sometime around June 2013. But, even after she left Mexico, E.G. sent one of his relatives to her mother's house in Mexico to ask for her phone number and whereabouts.

Drawing on this testimony, N.Y.C.C. argued that she was entitled to asylum on the basis that she fears persecution as the mother of a cartel member's child and as a Mexican woman who cannot leave her relationship. The immigration judge found that, although N.Y.C.C. testified credibly, her testimony fell short of establishing past persecution or a well-founded fear of future persecution and an inability to relocate in Mexico to avoid persecution. So the judge denied her asylum application. In doing so, the immigration judge added that N.Y.C.C. had not shown she was a member of either social group she identified—Mexican women who cannot leave their relationship and mothers of a cartel member's child—because she did leave her relationship and her belief that E.G. was a cartel member was too speculative.

The Board of Immigration Appeals agreed and dismissed her appeal.

## II

"Typically, when the [Board of Immigration Appeals] issues a decision, that decision becomes the basis for review." *Moab v. Gonzalez*, 500 F.3d 656, 659 (7th Cir. 2007). But when the Board adopts the immigration judge's findings, as it did here, "we review the immigration judge's findings as

supplemented by the Board's." *W.G.A. v. Sessions*, 900 F.3d 957, 962 (7th Cir. 2018). We review questions of law *de novo* and findings of fact for "substantial evidence." See *Cece v. Holder*, 733 F.3d 662, 675–76 (7th Cir. 2013) (*en banc*). Whether a petitioner suffered past persecution or harbors a well-founded fear of future persecution are factual findings subject to the deferential "substantial evidence" standard, allowing us to reverse only if the evidence compels a different result. See *Sirbu v. Holder*, 718 F.3d 655, 658 (7th Cir. 2013) (explaining that "whether the facts *compel* a finding of past persecution is the standard for judicial review").

To receive asylum, a petitioner must establish that she is "unable or unwilling" to return to her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). An applicant grounding her petition on a well-founded fear of future persecution by a non-government actor faces the added burden of establishing that she cannot reasonably relocate to another part of her home country to avoid future persecution. See 8 C.F.R. § 1208.13(b)(3)(i).

While neither the Immigration and Nationality Act nor its implementing regulations define "persecution," we have explained that the term does not require the conduct be "life-threatening or freedom-threatening," *Ahmed v. Gonzalez*, 467 F.3d 669, 673 (7th Cir. 2006), but it "must rise above mere harassment," *Orellana-Arias v. Sessions*, 865 F.3d 476, 487 (7th Cir. 2016). We have determined persecution to be "the use of *significant* physical force against a person's body," "the infliction of comparable physical harm without direct application of force," and "nonphysical harm of equal gravity." *Stanojkova v.*

*Holder*, 645 F.3d 943, 948 (7th Cir. 2011). Mere harassment, on the other hand, "involves targeting members of a specified group for adverse treatment, but without the application of significant physical force." *Id.* "The line between harassment and persecution is the line between the nasty and the barbaric or alternatively between wishing you were living in another country and being so desperate that you flee without any assurance of being given refuge in any other country." *Id.*

Persecution most often manifests itself in the form of "governmental persecution." *Hor v. Gonzales*, 421 F.3d 497, 501 (7th Cir. 2005). But an applicant can nonetheless claim persecution by a private actor (such as by a cartel or one of its members), and such a claim may succeed if "the government either condones it or is helpless to prevent it." *Id.*; see also *Plaza-Ramirez v. Sessions*, 908 F.3d 282, 286 (7th Cir. 2018) ("Generalized violence simply does not justify relief.").

## A

We first consider N.Y.C.C.'s challenge to the immigration judge's determination that she did not suffer past persecution. Threats like the ones N.Y.C.C. testified to E.G. leveling must be "credible, imminent and severe" before we will consider them persecution. *N.L.A. v. Holder*, 744 F.3d 425, 431 (7th Cir. 2014). In *N.L.A.*, for example, threats directed at an asylum applicant by guerillas from the Revolutionary Armed Forces of Colombia who murdered her uncle and kidnapped her father amounted to persecution "because the FARC backs them up with acts of violence when its demands are not met," and in that instance, the FARC "proved that they would follow through on their threats by killing the uncle and kidnapping the father—the gravest harms possible." *Id.* at 432.

Here, by contrast, nothing from the evidence compelled the immigration judge to conclude that E.G.'s threat was "credible, imminent and severe." *Id.* at 431. E.G. made only a single vague threat to take N.Y.C.C.'s sons, including the "bad way," if she did not move back in with him. But in the months and indeed years that followed, E.G. never acted in furtherance of this threat. And this is true despite him knowing where N.Y.C.C. was in Mexico at almost all times. E.G. had every opportunity to follow through on the threat but never did. On this record, then, the immigration judge was on solid ground when concluding that E.G.'s threat did not amount to persecution because it was too vague and never materialized into a more acute and substantial risk to N.Y.C.C. or her family. See *Bejko v. Gonzalez*, 468 F.3d 482, 486 (7th Cir. 2006) ("Threats can constitute past persecution only in the most extreme circumstances, such as where they are of a most immediate or menacing nature or if the perpetrators attempt to follow through on the threat.").

The immigration judge was on similarly strong footing when concluding that E.G.'s harassing conduct while driving by her home and workplace fell short of establishing past persecution. The harassment never crossed the line of presenting the sort of grave physical or emotional harms we have required in the past to show persecution. See *Stanojkova*, 645 F.3d at 948; see also *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003) (explaining that "actions must rise above the level of mere harassment to constitute persecution"); *Sirbu*, 718 F.3d at 659 n.3 (listing cases affirming findings of no past persecution that included conduct such as detaining a petitioner in primitive conditions without medical treatment and hitting another petitioner in the face).

B

N.Y.C.C. separately challenges the immigration judge's conclusion that she failed to demonstrate a reasonable fear of future persecution. But here, too, we do not see evidence in the record compelling a contrary finding. E.G.'s prior threat and related behavior did not amount to past persecution, so without evidence to suggest that E.G.'s conduct will escalate in the future, the facts fall short of requiring us to conclude N.Y.C.C. will face future persecution. See *Boykov v. I.N.S.*, 109 F.3d 413, 416–17 (7th Cir. 1997) (explaining that the petitioner did not suffer past persecution and his failure to present evidence showing his treatment would be any worse in the future undermined his claim to having a well-founded fear of future persecution).

Nor does the record compel us to upset the immigration judge's related finding that, even assuming N.Y.C.C. had a well-founded fear of future persecution, she failed to demonstrate that she was unable to relocate to another part of Mexico. N.Y.C.C. insists she would not be safe anywhere in Mexico. The facts do not support such an unyielding conclusion. We cannot say that the record evidence precluded the immigration judge from observing that E.G. lacked the intent or resources not only to find her if she moved within Mexico, but also to then persecute her. The record also falls short of compelling the conclusion that the Mexican government would be unable or unwilling to help N.Y.C.C. in such a scenario. At the very least, there is no error in the immigration judge's more limited finding that N.Y.C.C. is fluent in Spanish, spent nearly all her life in Mexico, and has successfully worked at a restaurant there—skills and experience that reasonably allow her to relocate.

C

We turn to N.Y.C.C.'s contention that the immigration judge committed legal and factual error that warrants remand by concluding N.Y.C.C. did not sufficiently demonstrate E.G. was a cartel member. In her view, this was a crucial fact—capable of undermining the immigration judge's key conclusion that she did not suffer past persecution and lacked a well-founded fear of future persecution. Invoking decisions from the Second and Ninth Circuits, she argues that the immigration judge committed legal error by failing to "give [her] notice of the corroboration that is required and an opportunity either to produce the requisite corroborative evidence or to explain why that evidence is not reasonably available." *Ren v. Holder*, 648 F.3d 1079, 1093 (9th Cir. 2011); see also *Zheng v. Lynch*, 646 F. App'x 50, 52 (2d Cir. 2016).

But this case does not require us to consider adopting such an approach because resolving whether E.G. was a cartel member is not necessary to the outcome here. By N.Y.C.C.'s own account, even though E.G. was a cartel member at the time he confronted her in the restaurant and threatened to take the children, he never used the cartel's resources to follow through or otherwise commit an act of violence towards her.

The reality is that E.G.'s conduct—regardless of his affiliation with the La Familia cartel—did not compel the immigration judge to conclude that N.Y.C.C. suffered past persecution or harbors a well-founded fear of future persecution. See *Bathula v. Holder*, 723 F.3d 889, 900 (7th Cir. 2013) (explaining that, even though a group with the ability and resolve to kill its adversaries threatened the petitioner, the nature of the threats and the group's failure to follow through despite the

opportunity to do so reflected harassment, not persecution). The immigration judge therefore had no obligation to prompt N.Y.C.C. to submit further evidence towards an unnecessary factual dispute that did not matter to the ultimate outcome.

D

N.Y.C.C. has also appealed the immigration judge's denial of her request for withholding of removal and protection under the Convention Against Torture. Her asylum claim had the lowest burden of proof, so her failure to establish eligibility for asylum necessarily means that she cannot prevail on her withholding of removal and CAT claims. See *Toure v. Holder*, 624 F.3d 422, 428 (7th Cir. 2010) (explaining that a failure to prove persecution for purposes of asylum eligibility necessarily means a petitioner cannot meet the higher standard for withholding of removal); see also *Bathula*, 723 F.3d at 903 (explaining that the Convention Against Torture's requirement to show a future likelihood of torture is a more stringent standard than persecution).

*       *       *

N.Y.C.C. has been well-represented on appeal. In the end, though, she has not carried the weighty burden of showing that the record compelled the granting of asylum. For these reasons, we DENY the petition for review.